Jack Frederick GROVE, Plaintiff,

v.

The OHIO STATE UNIVERSITY, COL-
LEGE OF VETERINARY MEDICINE,
et al., Defendants.

No. C–2–75–829.

United States District Court,
S. D. Ohio, E. D.

Dec. 16, 1976.

John F. Holcomb, Hamilton, Ohio, for plaintiff.

William J. Brown, Atty. Gen., G. Ross Bridgman, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for defendants.

## OPINION AND ORDER

KINNEARY, District Judge.

Plaintiff in this action is attacking the admissions procedure and practice at the College of Veterinary Medicine at Ohio State University. He has made three unsuccessful attempts to obtain admission to the entering class at this facility, conforming in each instance exactly to the format specified by the bulletin of information published by the college. He now alleges that the college, its dean, and its assistant dean denied him due process of law in reaching an admissions decision, deprived him of equal protection of the law by admitting other, less qualified students in his place and made certain promises intending to induce action on his part, which action was indeed induced. The first two resulted in claimed violations of Title 42, United States Code, Sections 1983 and 2000d. The plaintiff has asked this Court to grant him affirmative relief in the form of an instruction to the defendant college to enroll plaintiff in its fall, 1976, entering class, and for damages in the amount of $50,000.00 to compensate him not only for the deprivations referred to above but also for the time lost pursuing a degree in reliance on the alleged promises of the defendants. This case was tried to the Court on September 27, 1976. Pursuant to Rule 52(a), Federal Rules of Civil Procedure, this Court now makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Jack Frederick Grove, plaintiff in this action, is a white male citizen of Ohio.

2. Defendants are The Ohio State University College of Veterinary Medicine [College], its dean, C. Roger Smith, and its assistant dean, Walter G. Venzke.

3. Plaintiff matriculated as an undergraduate student at Ohio State University in September, 1971. During his first quarter in college, plaintiff scored three "Ds", two in math courses and one in chemistry.

4. The admissions procedure of the College has at all times relevant to this action required submission of the applicant's overall grade-point average, his average in selected pre-professional courses, and the results of an interview with two members of the six-member admissions committee.

5. Beginning with the entering class of 1975, the admissions committee required also the submission of the scores achieved on the Veterinary Aptitude Test (VAT). This is an objective-type test designed to measure ability in certain cognate areas determined to be necessary to the study of veterinary medicine.

6. Defendants' standard practice, which was followed here, is to subject each applicant to an initial screening process. Some fifty percent of the applications received are rejected at this stage.

7. One of the reasons for rejection at the initial screening is failure to meet one or both of the cut-off standards set by the committee. These are a cumulative undergraduate average of 3.0 and a score on the VAT in the 80th percentile.

8. Students whose scores do not meet these initial standards may avoid rejection at this stage by requesting a personal interview. Students meeting these standards will automatically be interviewed.

9. The interviews are conducted by two members of the admissions committee, one of which is always either the dean or the assistant dean. The interviews are conducted separately and last about thirty minutes for each of the two interviewers.

10. The purpose of the interviews is primarily to ascertain the stage of the applicant's affective development and offer the applicant an opportunity to explain negative factors in his record. Consideration is given to the applicant's personality, professional bearing, interest in the veterinary profession, and experience with animals. The interviews are rated by each interviewer separately on a standard evaluation form. Samples of these forms were admit-

ted into evidence as Joint Exhibits If, Ig, In and Io.

11. Where the two interviewers disagree on whether or not the applicant should be admitted, the matter is referred to the entire admissions committee for consideration. Additional interviews may be scheduled if they are deemed expedient.

12. On the basis of these interviews and the applicant's test scores and scholastic averages, 130 successful applicants are selected and a waiting list is prepared.

13. Any openings among the 130 applicants offered admission are filled from the waiting list.

14. The evaluative material submitted by each applicant is weighted as follows in reaching a determination as to admission:

```
Personal interview . . . . . .   45%

Quantitative factors (VAT,
grade-point averages, etc.). .   55%
```

15. In February and March, 1973, while plaintiff was a sophomore, he applied for admission to the College of Veterinary Medicine. His interviews were conducted by Robert Hamlin, a professor of veterinary physiology who was at that time on the admissions committee, and defendant Venzke.

16. Hamlin testified that at the conclusion of the interview he determined that plaintiff was qualified for admission "now or next year." Venzke concluded that he was a "great prospect for '74."

17. Plaintiff was denied admission into the 1973 entering class on the grounds that he lacked five quarter hours of elective courses. He was notified that upon completion of this requirement he could reapply for admission into the 1974 entering class. Joint Exhibit Ix.

18. During the month of October 1973 plaintiff prepared a second application for admission into the College of Veterinary Medicine. Again, an interview was conducted, this time by Dr. Marion Scothorn, a member of the admissions committee, and defendant Venzke.

19. Dr. Scothorn's evaluation of plaintiff assigned him a rating of 80 out of a possible 100. Defendant Venzke, using the same evaluation form, arrived at a rating of 72.

20. Neither interviewer made any comments with regard to plaintiff, but both selected the "strongly recommend" category for plaintiff's overall rating.

21. In February, 1974 plaintiff received notice that he had been rejected for admission into the 1974 entering class.

22. Plaintiff sought and obtained a conference with Dr. Venzke in order to ascertain the reasons for his rejection and what corrective measures, if any, could be taken. Plaintiff was told to take more courses in animal science to improve his chances of admission. No indication was given that his deficiency in science and math had in any way affected the decision of the admissions committee.

23. In October and November 1974 plaintiff applied for admission to the college's entering class of 1975. For the first time, plaintiff was required to take the Veterinary Aptitude Test [VAT] as one of the prerequisites to consideration.

24. Plaintiff took this test in November, 1974 and was ranked in the 55th percentile. On the individual portions of the test, he received percentile rankings of 75 each in reading comprehension, science and verbal memory and 10 in quantitative ability.

25. Since plaintiff's percentile rank of 55 did not meet the cut-off requirement of 80, plaintiff was forced to request a personal interview. This interview was conducted, as before, by two members of the admissions committee: Dr. Venzke, and Dr. Keith Wearly. Ranked on a slightly altered interview form from before, plaintiff received a rating of 81 from Dr. Wearly and 73 from Dr. Venzke.

26. Plaintiff was again rejected. No reason was given in the letter of rejection, but other letters introduced into evidence and testimony adduced at trial suggest that the reason was both the low score on the

Veterinary Aptitude Test and the low grades in quantitative courses.

27. In the entering class of 1975, to which plaintiff had sought admission, there were a total of 131 students selected from 907 applicants. In addition, 29 applicants were placed on the "waiting list." None of the successful applicants in this class declined the offer of admission. Plaintiff was not included on the waiting list.

28. Only one minority student, a black, was admitted into the entering class of 1975.

29. At the time of plaintiff's third application, his cumulative grade point average was 3.27 out of a possible 4.00; his grade-point average in selected preprofessional courses was 2.59; his Veterinary Aptitude Test Score was in the 55th percentile; and his average interview score was 76 out of a possible 100.

30. Of the students matriculating in 1975, 21 had cumulative grade-point averages lower than plaintiff's 3.27, one had an average in the selected preprofessional courses lower than plaintiff's 2.59, one had a VAT score lower than plaintiff's 55th percentile, and four had an admissions evaluation score lower than plaintiff's 76. Of the four whose overall evaluation scores were lower, three had VAT scores in the 90th percentile or higher. Plaintiff's Exhibit 21.

31. This Court takes judicial notice pursuant to Rule 201(b), (f), of the Federal Rules of Evidence that the average grade-point average for the entering class of 1975 was 3.53 and that the average grade-point average in preprofessional courses was 3.45.

32. Of the 29 students placed on the waiting list in 1975, 21 had cumulative grade-point averages lower than that of plaintiff, one had a preprofessional grade-point average lower than plaintiff's, two had lower VAT scores, and 13 had lower average interview scores. Eight were lower in two categories, one in three, and one in all four. Again, the Court takes judicial notice that the average cumulative grade-point average of the students on the wait-ing list is 3.15 and the average preprofessional grade-point average is 3.11.

33. Plaintiff's background evidences considerable experience with animals and interest in the practice of veterinary medicine. He has trained animals on the family farm and was active in 4–H in high school. He has a cousin who is a well known veterinarian and with whom he has remained in fairly close contact.

34. These qualities were impressed on those individuals who interviewed plaintiff. Indeed, defendant Venzke admitted that if motivation were the best criteria on which to determine admissibility, then plaintiff should be admitted. Plaintiff testified, without contradiction, that he sincerely wanted to be a veterinarian.

### Discussion

As noted earlier, plaintiff's complaint is based on three legal theories. First, he is complaining that the incorporation of the results of a personal interview score into an otherwise objective admissions formula introduces a subjective factor which makes the admissions procedure unreasonable, arbitrary, and capricious and deprives him of "personal rights" without due process of law. Secondly, he urges that the admission of less qualified students than himself, and the failure to admit other students as well or better qualified than himself are both unconstitutional denials of equal protection of the laws. Finally, he claims that he was promised admission during his first interview and following his second rejection if he would fulfill certain additional requirements, that he relied on these promises and acted accordingly, and that this resulted in detriment for which he claims damages. These claims will be considered in succession.

### Due Process:

In any action alleging a deprivation of an interest without due process of law it is first necessary to consider the nature of the interest. Not all interests merit constitutional protection. *See Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36

382

(1972). "[W]hile the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). In delineating these boundaries, it is standard for a court to ascertain whether the interest invaded is a "liberty" or a "property" interest, and that distinction will be adhered to here.

█ The Court in *Roth,* which also utilized this bifurcated analysis to investigate a claimed due process violation, found that there was a liberty interest in the right "to contract, to engage in any of the common occupations of life, to acquire useful knowledge . . . ." *Id., citing Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). It concluded, however, that plaintiff's liberty interest was not violated by the state university's failure to renew his contract, since there was no suggestion that his right to obtain similar employment elsewhere was affected, or that his standing or reputation in the community had been damaged. In other words, the Court distinguished between a "general" right to engage in a chosen occupation, and a specific right to a particular position. Absent some form of property interest—to be discussed shortly—due process protection attaches only to the former interest, although denial of a specific position may be done in such a manner as to constitute a denial of the liberty interest in a general occupation. *See, e. g., Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

█ The *Roth* Court, however, was proceeding under the express assumption that the plaintiff-respondent had not been foreclosed from "a range of opportunities." 408 U.S. at 574, 92 S.Ct. 2708. There was "no suggestion of how nonretention might affect the respondent's future employment prospects." *Id.* at n.13. But plaintiff suggested at the trial of this case, without rebuttal, that the highly competitive nature of the veterinary profession, coupled with the relatively few institutions offering training programs, meant that a denial of admission by one institution effectively foreclosed consideration by any of the others. At least facially it would appear that a rejected applicant for admission to a veterinary school is in much the same situation as a rejected applicant for admission to the bar of a state (which had been the standard of comparison in *Roth*). In both instances there is an effective denial of the opportunity to participate in a chosen occupation. Since this impinges on a liberty interest, due process requires that the reasons for rejection have a rational connection with the profession the applicant is seeking to enter. *Schware v. Board of Bar Examiners, supra; cf. Ashbacker Radio Co. v. F.C.C.,* 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). Significantly, the *Schware* Court, which had considered the bar admission requirements, attached no significance to the fact that plaintiff could still seek admission to the bar of another state, or to the fact that plaintiff was not precluded from applying for admission to the New Mexico bar at a later date (although the utility of such an application would have been questionable in view of the fact that the associations forming the basis of plaintiff's rejection were over fifteen years old). By parity of reasoning, it would seem that little significance should be attached to the fact, vehemently asserted by defendants at trial, that plaintiff could and did repeat the admissions procedure.

█ Of course, there is the distinction that here the state—through The Ohio State University—is foreclosing only one form of access to training for a particular occupation, rather than access to the profession itself. Arguably, plaintiff could still obtain instruction from another source, perhaps a private one, and qualify to practice as a veterinarian. However, such a distinction is a meaningless one. The bulletin for the College, introduced into evidence as Joint Exhibit III, indicates that the program leading to the Doctor of Veterinary Medicine degree covers four years. It also provides that "Regular attendance for

scheduled work is required," and treats instances of irregular attendance as "a case of discipline." Joint Exhibit III, at 17–18. This Court finds that these two factors alone are sufficient to indicate that self-preparation is not to be considered a viable alternative. Consequently, defendants' denial of admission to plaintiff infringed on a liberty interest of the plaintiff.

Due process of law is also required before a state may infringe on a property interest of one of its citizens. Here, again, *Roth* provides the necessary parameters for deciding whether such an interest exists.

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

408 U.S. at 577, 92 S.Ct. at 2709. Under normal circumstances an applicant for admission does not have a property interest in being admitted. It would strain reason to find a "legitimate claim of entitlement" where only 130 out of approximately 900 applicants are admitted. Borrowing from the common law of property, an unsuccessful applicant is at most being deprived of a contingent interest which vests upon his meeting the required qualifications. His interest could not be described as a vested one subject to divestment in the event of certain shortcomings.

However, plaintiff has claimed that in his case the university officials indicated that he would qualify for admission if he took certain required courses. Although it appears that plaintiff regards these statements as giving rise to some form of promissory estoppel, they also raise the issue in the present context of whether plaintiff might nonetheless have a property interest under the doctrine of *Perry v. Sindermann*,

408 U.S. 593, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972). In *Perry* the Supreme Court relaxed to some extent the holding of *Roth* and concluded that a property interest might exist where "the policies and practices of the institution" might give rise to an objective expectation of entitlement.

Such is not the case here. In the first place, the operative facts distinguish this case from *Perry*. The de facto tenure program in *Perry* which formed the basis for the plaintiff's property interest applied to all teaching personnel. It was therefore a more "objective" expectation than a statement concerning Grove's readiness for admission after completing recommended additional courses. Conversely, Grove's interest is more akin to a subjective expectancy, to which the *Perry* Court refused to ascribe a property interest. This conclusion is supported by the testimony offered at trial. Grove was at no time promised admission to the College. He was informed, variously, that admission would be recommended, that a stronger background in the area of animal science would improve his chances for admission, that he appeared sincere and highly motivated. Such statements could reasonably give rise to an expectation of admission. But the expectation would be a subjective one. There is nothing to support a conclusion that this was a consistent policy or practice of the institution to which an objective conclusion regarding admissibility could be ascribed.

Nor are the plaintiff's circumstances comparable to the unusual facts giving rise to the Sixth Circuit's extension of the *Perry* rationale in *Soni v. Board of Trustees of the University of Tennessee,* 513 F.2d 347 (6th Cir. 1975), *cert. denied,* 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976). In *Soni* the plaintiff had been a visiting professor at the University of Tennessee. During his evaluation for tenure, the tenure committee discovered that Tennessee law prohibited him, as an alien, from obtaining tenure. No vote was taken, but Soni was assured by participants in the evaluation meeting and the acting head of his department that the tenure committee's action had been favor-

able and that the only hurdle remaining to be overcome was his lack of citizenship. In reliance on these representations, Soni purchased a home and stopped seeking employment elsewhere. More importantly, Soni was thereupon permitted to participate in activities normally reserved for tenured personnel. Jack Grove, however, had never been led to believe, even subjectively, that his application had actually been passed upon with favorable consequences. Any suggestions which defendants made as to the benefit of certain preprofessional courses were directed toward future consideration of his application. There was no intimation that the courses were only a technical requirement standing between him and an admission already granted. Accordingly, this Court cannot conclude that plaintiff was deprived of a property interest by defendants' failure to admit him.

Because of this Court's earlier conclusion that plaintiff was deprived of a liberty interest by the committee's rejection, however, it is still incumbent upon this Court to ascertain whether he was accorded due process. In making its determination, this Court will be viewing the question of due process from two perspectives: whether the factors forming the basis for the admissions committee's decisions are properly related to the study of veterinary medicine, and whether the process of making an admissions decision accords applicants a reasonable opportunity to present arguments on their own behalf before a neutral decision-maker. "The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 784, 58 L.Ed. 1363 (1914).

■ One of the basic requirements of due process, invoked particularly where a decision has been made by an administrative body exercising quasi-independent decision-making authority, is that the reasons for making the decision support the decision made. *See Schware v. Board of Bar Examiners, supra; Slochower v. Board of Higher Education*, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); *Tyler v. Vickery*, 517 F.2d

1089 (5th Cir. 1975), *cert. denied*, 426 U.S. 940, 96 S.Ct. 2660, 49 L.Ed.2d 393 (1976).

Plaintiff argues vehemently that the structure of defendants' admissions process does not meet this requirement, that by assigning a weight of 45 percent to the applicant's oral interview score the defendants have introduced a subjective factor which "leave[s] the interviewer's discretion virtually unfettered" and "opens the door for possible cultural or social discrimination." Plaintiff's posttrial memorandum, at 4. In support of his assertions, he points to the "significant" change in the attitude of Dr. Venzke over the course of his three interviews with the plaintiff. Plaintiff does not, however, contest the other components of the evaluation, such as the Veterinary Aptitude Test or the average in selected preprofessional courses.

■ This Court does not consider the determination of the proper weight to be accorded an interview score in a university's admissions evaluation to be properly within its purview unless it is clearly erroneous. "By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems . . . .." *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). There was ample testimony at trial to support assigning so large a weight to the only available measure of a candidate's affective development. Consequently, this Court will devote no further consideration to the 45 percent weight attached to the personal interview. On the other hand, whether the use of a personal interview introduces factors "so vague and arbitrary as to deny a fair opportunity to meet the admission requirements" as claimed by the plaintiff is a matter properly before the Court at this time.

While this Court recognizes that there is a certain degree of subjectivity present in all personal interviews, the facts presented in the trial of this case indicate that this particular procedure is not so arbitrary as to make it irrelevant to the determination

of an applicant's prospective performance in the veterinary college program and therefore a denial of due process of law. Defendant Smith, Dean of the College of Veterinary Medicine, asserted at trial that the admissions committee was seeking to evaluate applicants on both cognitive and affective levels of development. He pointed out, without contradiction, that cognitive factors lend themselves to objective testing and were behind the committee's decision to incorporate the applicant's grade-point average, his Veterinary Aptitude Test score, and his average in selected preprofessional courses into the evaluation calculus. Affective development, typified by an individual's professional bearing, his ability to relate with others, and with animals, and his interest in the profession, cannot usually be measured directly or with any great degree of objectivity. It was in order to measure these factors that the committee required a personal interview and character references from prospective students.

This Court does not seriously doubt that factors such as professional bearing and interest in the profession do affect a student's success as a student and as a veterinarian and no evidence to the contrary was offered at trial. This case is therefore distinguishable from *Schware, supra* (arrests over fifteen years old and membership in Communist party two decades earlier held insufficient basis for finding a lack of good moral character) and *Slochower, supra* (assertion of Fifth Amendment privilege against self-incrimination in testimony before federal legislative committee held insufficient basis to justify terminating employment). Given that the items measured are relevant to future performance as a student, the question remains whether the admissions procedure itself permitted such great subjectivity as to constitute a denial of due process.

Preliminarily, it is important to point out one question which is not before the Court at this time. Plaintiff raised the specter of possible cultural and social discrimination resulting from the interview procedure. This issue was not considered at trial and,

indeed, it is highly doubtful that plaintiff would have had standing to raise it. Accordingly, this Court makes no intimation as to whether the interview procedure might discriminate against persons other than the plaintiff.

Although this Court intends to address the constitutional propriety of defendants' full admissions procedure, it is helpful first to evaluate the most contested component of that procedure—the personal interview. This Court finds that defendants' interview procedure adequately protected plaintiff's right to fair and impartial consideration of his application and did not deprive him of due process. It was clearly designed to minimize any undue influence stemming from individual predilections of the interviewers. First, there were two interviewers, and one of these was either the dean or the assistant dean. Second, whenever these two interviewers reached opposite conclusions, the matter was brought before the full admissions committee for resolution. If this disparity manifested itself on the full committee as well, then another interview could be scheduled. Third, the interview forms, copies of which have been admitted into evidence as Joint Exhibits In and Io, introduce a degree of objective quantification to the interviewer's analysis of the interview and ensure that each applicant will be evaluated on basically the same criteria. The terms which are used on the forms are clear and straightforward. To the extent that it is possible to inject objectivity into a measurement criterion which is being used precisely because it sheds some light on subjective and unquantifiable factors, this procedure does so. This Court does not find the interview procedure lacking in due process because of the manner in which it is conducted and the results used.

In reaching the above conclusion this Court has given little weight to the claimed inconsistency in Dr. Venzke's evaluations of his three interviews with the plaintiff. The inconsistency is more apparent than real. During the first interview Dr. Venzke noted plaintiff's motivation and interest but

made reference to plaintiff's mediocre performance in certain courses. This is substantially the same conclusion reached in the last interview, except that it had become clear from plaintiff's performance in additional chemistry courses and on the Veterinary Aptitude Test that plaintiff suffered from serious deficiencies in mathematics and science. As for Dr. Venzke's inability to remember that plaintiff had taken his course in veterinary anatomy, this Court does not find that indicative of a lack of objectivity on the part of Dr. Venzke. It must be remembered that Dr. Venzke was personally interviewing more than 200 students each year in addition to his other functions as assistant dean.

■■■■ Having determined that the personal interview did not itself constitute a denial of due process, this Court now turns to the more general issue: whether the evaluation procedure used by the College of Veterinary Medicine is itself constitutionally proper. In making this determination it should be recalled that "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); see *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Tyler v. Vickery*, 517 F.2d 1089 (5th Cir. 1975), cert. denied, 426 U.S. 940, 96 S.Ct. 2660, 49 L.Ed.2d 393 (1976). It involves weighing the precise nature of the governmental interest with the private interest which has been affected by the governmental action. *See Goldberg v. Kelly*, 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

■■■■ The nature of these interests is self-evident. "The student's interest is to avoid unfair or mistaken exclusion from the educational process." *Goss v. Lopez*, 419 U.S. at 579, 95 S.Ct. at 739. Accordingly, he expects an impartial decisionmaker and an opportunity to present favorable information to the decisionmaker. The state's interest is in an expeditious, but fair, selection of those applicants who are best quali-

fied to undertake the program in veterinary medicine.

This Court finds that the evaluation procedure employed in the College conforms to constitutional requirements. Plaintiff was on three separate occasions accorded an opportunity to meet with the admissions committee and present favorable information to support his application. At those times he had the opportunity, if he chose, to offer explanations for his poor performance during his first quarter of undergraduate study and for his apparent shortcomings in math and chemistry. Indeed, the evidence suggests that plaintiff did make a substantial impression and had apparently convinced the committee that his first quarter grades were an aberration. Parenthetically, it should be pointed out that this opportunity to be heard was available upon request to those applicants whose scores suggested that they would be unable to meet the minimum requirements. Plaintiff concededly availed himself of this provision on his third application. Nor can this Court find fault with the decisionmaker. Plaintiff's only suggestion of bias is his subjective conclusion that Dr. Venzke was not impartial because he appeared disinterested during the third interview. This Court has already indicated that it finds this suggestion to be without merit.

The admissions procedure must also be evaluated in light of the university's interest in expeditious admissions decisions. It is instructive to consider *Tyler v. Vickery*, supra, in this context. In that case the Fifth Circuit, ruling on plaintiffs' demand for due process hearings for unsuccessful applicants for admission to the Georgia bar, looked at the substantial number of persons failing the bar each year, the possibility of reexamination, and the fact that the examiners were not full-time administrators and held that a hearing requirement would constitute an "intolerable burden." Here, too, there is a substantial number of unsuccessful applicants (more than 750 each year), subsequent applications may be made, and the members of the admissions committee must perform other functions as well. Ac-

cordingly, this Court concludes that in light of the guarantees built into the present admissions system and the heavy burden which additional procedural requirements would place on the admissions committee, the admissions procedure afforded Jack Grove due process.

*Equal Protection:*

The second prong of plaintiff's attack on the admissions procedure at the College of Veterinary Medicine asserts that plaintiff was denied equal protection of the laws. Plaintiff points both to successful applicants whose scores were lower than his on one or more of the objective factors influencing admission and to other unsuccessful applicants whose scores were higher, and urges that these are indicative of an arbitrary and capricious admissions process which treats similarly situated applicants differently.

▉ The standard equal protection analysis encompasses three phases. First, the Court must determine whether different persons similarly situated are in fact being treated differently. If it finds that they are, it must next ascertain whether the difference in treatment operates to the disadvantage of a suspect class or impinges upon a fundamental right, in which case strict judicial scrutiny must be applied. If it can find no such detriment, then the Court must investigate whether the difference in treatment furthers some legitimate, articulated state purpose. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *cf. Dunn v. Blumstein,* 405 U.S. 330, 335, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

The evidence presented in this case suggests that there is at least a facial distinction in the manner in which plaintiff and certain other candidates were treated.

Four individuals who were admitted to the entering class of 1975 had lower scores on their admissions evaluation forms than did the plaintiff. Fifteen of the candidates placed on the waiting list had scores higher than plaintiff's. Ostensibly, either plaintiff or one of these fifteen should have been offered the places which went to the four successful candidates.

This Court is reluctant to find that failure to adhere exactly to an admissions formula constitutes a denial of equal protection. The Supreme Court of California, confronting precisely the same issue, has ruled that

The University is entitled to consider, as it does with respect to applicants in the special program, that low grades and test scores may not accurately reflect the abilities of some disadvantaged students; and it may reasonably conclude that although their academic scores are lower, their potential for success in the school and the profession is equal to or greater than that of an applicant with higher grades who has not been similarly handicapped.

*Bakke v. Regents of University of California,* 18 Cal.3d 34, 132 Cal.Rptr. 680, 694 (1976). In other words, even more subjective factors than those comprising a measure of the applicant's affective development might permissibly be considered without denying applicants equal protection. Here, for example, all but one of the four had VAT scores ranking in the 90th percentile or better. Other factors might also have motivated the committee to prefer these four over plaintiff and others.

▉ This Court, however, does not find it necessary at present to decide whether the use of unspecified subjective factors constitutes a denial of equal protection. Assuming arguendo that it did,[1] and that

1. This obviates any consideration of defendants' alleged failure to give effect to their "minimum standards" for consideration. Plaintiff has claimed, variously, that as an Ohio citizen with a point-hour ratio above 2.75 he was entitled to "first consideration" by the committee (*see* Joint Exhibit III, at 6) and that defendants violated their admissions guidelines by giving consideration to individuals with an undergraduate grade-point average below 3.0 (Joint Exhibit IV, at 2). As with the question of failure to abide by the evaluation form a conclusion on whether these actions are violative of equal protection is unnecessary in light of this Court's subsequent posture in this case.

388

plaintiff was in fact treated differently from others similarly situated, such discrimination is still permissible if it qualifies under either the strict scrutiny or rational basis test (whichever is applicable). This Court concludes that the strict scrutiny test is inapplicable and that there is a rational basis for defendants' actions.

It is apparent that the discrimination alleged here did not involve a suspect class or infringe upon a fundamental right.

The Supreme Court has to date held that discrimination based on race, alienage, national origin, and sex is deserving of strict scrutiny at the hands of a reviewing court. *Frontiero v. Richardson,* 411 U.S. 677, 682, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). *But see Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). Only one minority applicant was offered a position in the 1975 entering class—and plaintiff has elected to withdraw the propriety of this person's admission from the consideration of the Court. A fortiori, there is no denial of admission based on race, alienage, or national origin. Nor has there been any suggestion by plaintiff that defendants' refusal to admit him was sex-based. Whatever denial of equal protection there is in this case, it is not based on a suspect classification.

■ Nor is plaintiff's right to an education a fundamental one. Unlike the right to vote or the right to travel, it is not implicitly or explicitly guaranteed by the Constitution. *See generally San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 33, 34, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Since the denial of equal protection is not based on a suspect classification and does not infringe upon a fundamental right, this Court need not apply a strict scrutiny analysis to the question of its constitutionality.

Instead, the focus of the analysis becomes whether the admissions procedure rationally furthers a legitimate, articulated state purpose. There is no direct statutory indication of such a purpose. However, the goal of the College of Veterinary Medicine set forth in *Joint Exhibit III* is

to offer a superior veterinary medical education for young men and women. In addition, the College has a responsibility and an obligation to develop better means for the prevention and control of diseases of all species of animals, including those transmissible to man.

Since this is subject to the approval of the university's board of trustees, and since that body is the statutory authority vested with the government of the university, *see* Ohio Revised Code Section 3335.02 (Page Supp.1975), the statement above may be regarded as a proper statement of purpose for the College of Veterinary Medicine.

The admissions procedure adopted by the College rationally furthers such a goal. A superior education requires not only superior teaching and instructional facilities, but also superior students, students who are intellectually and emotionally capable of absorbing the material provided, of interacting with instructional personnel for the benefit of both, and of utilizing the knowledge obtained long after graduation for the benefit of the community. As such, an admissions committee entrusted with winnowing out 130 capable students from almost 1000 applicants may well determine that finding students meeting the above requirements necessitates giving weight to both cognitive and affective aspects of the individual's development. It may well conclude, as here, that a personal interview is the best, most efficient means of ascertaining in depth the extent of a candidate's affective development and that a Veterinary Aptitude Test score is a unique measure of a candidate's development in subject-matter areas generally considered relevant to the veterinary school curriculum. Accordingly, any denial of equal protection which may have accompanied defendants' admissions procedure does not constitute a constitutional deprivation. Nothing in this conclusion should be viewed as suggesting a particular outcome where a suspect category is involved. That question, as noted earlier, is not before the Court at this time.

*Promissory Estoppel:*

Plaintiff has further charged that he relied to his detriment upon representations allegedly made during his first two interviews. He claims that had these representations not been made, he would have entered a different field. No indication was given, however, as to what this different field would have been.

Plaintiff's claim sounds in promissory estoppel. Section 90 of the Restatement of Contracts provides:

> A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

Whether Ohio recognizes this doctrine is open to some question. Neither party referred to this issue in its posttrial memorandum, and this Court has been able to locate only sparse authority. That authority appears to indicate, however, that Ohio would adopt Section 90, if only because "of its own vigor it is adequate authority." *W. B. Saunders Co. v. Galbraith,* 40 Ohio App. 155, 159, 178 N.E. 34, 35 (1931); *see Moore v. Foresman,* 172 Ohio St. 559, 179 N.E.2d 349 (1962); *Davis v. Famous Coal Co.,* 4 Ohio Op. 178, 4 Supp. 53 (Mun.Ct.1935); *cf. Dillow v. Phalen,* 106 Ohio App. 106, 153 N.E.2d 687 (1957).

Turning initially to the first interview, this Court finds that there was no promise upon which a finding of promissory estoppel could be grounded. While it appears that Professor Hamlin represented to plaintiff during the course of the interview that he would recommend him for admission, this is hardly a promise of admission and, in any event, its effect is negated by defendants' letter to plaintiff of June 8, 1973. This letter, which was admitted into evidence as Joint Exhibit Ix, informs plaintiff of the deficiencies in his pre-professional course requirements and then states:

> If you can arrange to complete the above courses next year and wish to apply for the 1974 entering class, please let us know. We will then send you the necessary forms to reapply to the College of Veterinary Medicine.

Such language discounts any promissory element in the representations of Professor Hamlin.

A more extended analysis applies to the second set of representations of which plaintiff complains. Plaintiff received a letter of rejection following his second interview, and thereupon consulted Dr. Venzke about his proper course of action. Dr. Venzke advised plaintiff that he should take additional courses in animal science. There is no indication that he cautioned plaintiff that taking these courses would not guarantee his admission, or that other problems lay at the base of his rejection. Since Dr. Venzke was a member of the admissions committee, and since plaintiff was clearly approaching him to ascertain what was necessary to obtain the admission which he had only recently been denied, this Court concludes that Venzke could reasonably have expected his statements to induce plaintiff to take additional courses in animal science.

Nevertheless, this Court is not disposed to grant judgment for the plaintiff for any detriment incurred as a result of such reliance because plaintiff has not established that "injustice can be avoided only by enforcement of the promise." As defendants remind this Court in their posttrial memorandum, plaintiff has utilized his Ohio State degree to gain an admission to the University of Dayton Law School. The additional courses which plaintiff took after Venzke's representation were included in that degree, and can hardly be considered detrimental. Moreover, any damages which plaintiff did incur by taking the additional courses are too speculative to permit an award from this Court. Plaintiff testified that it cost him between $1,500.00 and $1,800.00 per year to study at Ohio State. No attempt was made to break this down into the cost of those courses, if any, taken following Venzke's representation which were actually detrimental to plaintiff. The

doctrine of promissory estoppel, therefore, does not support a remedy here.

### Conclusions of Law

1. This Court has jurisdiction to hear plaintiff's claim that he was denied, by persons acting under color of state law, liberty and property interests without due process of law and equal protection of the laws under Title 28, United States Code, Section 1343(3).

2. Plaintiff's detrimental reliance claim and his constitutional deprivation claims are derived from a common nucleus of operative fact. This Court has jurisdiction to hear the detrimental reliance claim under the doctrine of pendent jurisdiction. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

3. Plaintiff had a liberty interest in being able to practice his chosen profession of veterinarian. Because of the unusual circumstances of this case, he was deprived of this interest by defendants' action refusing him admission to the College of Veterinary Medicine.

4. Defendants' admissions procedure accorded plaintiff due process of law.

5. This Court does not decide whether plaintiff was treated differently from other persons similarly situated under the defendants' admissions procedure. Assuming that he was, the procedure rationally furthered the legitimate goal of offering a superior veterinary medical education program. Strict scrutiny was not necessary since there was no indication that race, alienage, national origin, or sex had been a factor in the unequal treatment.

6. The only representation made to plaintiff upon which he might reasonably have relied was that made by Dr. Venzke following plaintiff's second rejection.

7. Plaintiff has failed to indicate the exact nature of damages incurred as a result of his reliance on Dr. Venzke's advice that he take additional courses in animal science, if any damages were incurred at all.

8. Plaintiff has failed to show any exclusion from a program or activity receiving federal financial assistance on the basis of race, color or national origin. He has therefore failed to demonstrate a right to relief under Title 42, United States Code, Section 2000d.

Accordingly, it is the decision of this Court that judgment be and it is hereby rendered in favor of the defendants on all claims set forth in plaintiff's complaint.