**Don CAREY, Plaintiff,**

v.

**FEDEX GROUND PACKAGE SYSTEM, INC., Defendant.**

No. 2:02–CV–1052.

United States District Court, S.D. Ohio, Eastern Division.

June 15, 2004.

Michael Garth Moore, Columbus, OH, Susan M. DiMickele, Squire Sanders & Dempsey, Columbus, OH, for Plaintiff.

Amy Ruth Ita, Squire Sanders & Dempsey, Columbus, OH, for Defendant.

## OPINION AND ORDER

MARBLEY, District Judge.

### I. INTRODUCTION

This matter is before the Court on the Motion for Summary Judgment filed by Defendant, FedEx Ground Package System, Inc. ("FedEx Ground"). Plaintiff, Don Carey, seeks to recover from Defen-

dant on theories of (1) race discrimination in violation of 42 U.S.C. § 1981; (2) breach of contract; (3) promissory estoppel; and (4) fraud. Plaintiff's claims are based on Defendant's failure to provide him with a delivery route as an independent contractor. Jurisdiction is proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. For the following reasons, Defendant's Motion is **GRANTED** in part and **DENIED** in part.

## II. BACKGROUND

For purposes of summary judgment, the Court will consider the facts in the light most favorable to Plaintiff.

Plaintiff, Don Carey, is an African American man. Since 1999, Carey has been a full time employee of Volvo. He works as a warehouseman on second shift, with an inflexible start time of 5:00 p.m. In early 2001, Carey, interested in owning his own business and in eventually leaving Volvo, saw an advertisement in the paper for contractor opportunities with FedEx Home Delivery, a division of FedEx Ground. On January 9, 2001, Carey attended a meeting at a local hotel to learn more about the contractor opportunities. The meeting was conducted by Phil Kelleher, a white man who was the terminal manager at FedEx Home Delivery's Groveport hub. As terminal manager, Kelleher had the discretion to add or revise a route, or to add or not add a contractor. He also had the authority to bind FedEx Home Delivery to a contract.

FedEx Ground is an Authorized Motor Carrier under the federal Motor Carrier Act pursuant to 49 U.S.C. §§ 13901 and 13902. As an Authorized Motor Carrier, FedEx Ground is required to comply with minimum safety standards published by the Department of Transportation ("DOT"). 49 U.S.C. § 13902; 49 U.S.C. § 31136. FedEx Home Delivery contracts with independent contractor drivers to perform delivery services. All such drivers operate under the motor carrier authority and registration of FedEx Ground. The Motor Carrier Act and corresponding regulations impose rigorous standards on all drivers, including, *inter alia,* that they take drug and alcohol tests, that they complete a road test, that they meet certain physical qualifications, and that they meet various vehicle inspection requirements. Based on these requirements and its own business needs, FedEx Home Delivery developed the FHD Safe Driving Program that is set forth in the FedEx Home Delivery Standard Contractor Operating Agreement.

At the January 9 meeting, Kelleher gave Carey a copy of a document entitled, "Build Your Future as a FedEx Home Delivery Contractor." The only identification of requirements in this document was the statement, "To become an independent contractor, candidates must be 21 or older; pass a Department of Transportation physical and drug scan; and have a satisfactory driving record." Also at this meeting, Carey filled out a three page "Contractor/Driver Information Sheet." On this form, Carey indicated that he would not be available to start working until February or March of 2001. On January 9, Kelleher submitted Carey's application to InQuest for a criminal background check. On January 10, InQuest cleared Carey for hire.

On January 11, 2001, Kelleher met with Carey individually. At this meeting, Carey and Kelleher both completed and signed a DOT form listing Carey's traffic offenses. Carey also filled out reference forms and alcohol and drug test verifications. In discussing his interest in the position, Carey informed Kelleher that his wife, Jackie, wanted to quit her job at Honda in order to be a housewife and to go back to school part time, and that he was trying to increase his income to com-

pensate. When asked, Carey told Kelleher that he was not going to quit his job at Volvo. Upon further discussion, Kelleher agreed that Carey could hire a backup driver to eliminate any potential conflict between the two jobs.[1] Carey testified at deposition that he understood it was his responsibility to secure a reliable backup driver before he could contract with FedEx Home Delivery.

On January 15, Kelleher received a motor vehicle record ("MVR") traffic offenses report for Carey. On January 18, Carey took, and passed, DOT physical and drug tests. On January 20, Kelleher provided his approval of Carey's application. On February 3, 2001, Carey spent all day at the terminal. He underwent a series of tests, including a full road test; he completed safety training; he met with Kelleher for a full interview; and he received numerous documents. Among these documents was a booklet entitled, "Becoming a QHD Pickup and Delivery Contractor," for which Carey signed an acknowledgment of receipt.[2]

Another one of the documents he received was the FedEx Home Delivery Standard Contractor Operating Agreement (the "Agreement"). Carey never read the Agreement and never signed that or any other contract with FedEx Home Delivery. When Kelleher gave him the documents, Kelleher told Carey not to worry about reading the documents because he would go over them in detail with Carey when Carey was assigned a route.

The Agreement provides that a contractor may employ "Qualified Persons" as drivers and that such drivers must meet the FHD Safe Driving Program standards:

Contractor may employ or provide person(s) to assist Contractor in performing the obligations specified by this Agreement. All persons so employed or provided by the Contractor, either driving or non-driving, shall be qualified pursuant to applicable federal, state and municipal safety standards and FHD Safe Driving Program standards as published from time to time.

The FHD Safe Driving Program standards are set forth as an addendum to the Agreement and list 13 minimum requirements for all drivers, including, *inter alia*, (1) no record of conviction for a felony; (2) a history of safe commercial driving experience and satisfactory work history; (3) evidence of a valid commercial driver's license; and (4) a current and satisfactory MVR abstract. All drivers also are required to comply with all applicable federal, state, and local laws.

At some point after the January 11 conversation, Carey contacted his brother, Greg Cross, about serving as a backup driver. After Cross agreed, Carey informed Kelleher that Cross was willing to serve as a backup driver and that his wife, Jackie, would also be available to fill in if necessary. Sometime in February 2001, Kelleher gave Carey an application form[3] and a consent form for his brother to

---

1. At deposition, Carey testified as follows:

   [Kelleher] asked me was I going to quit my full-time job and I said well, no, I'm not going to quit it and he asked me how would I do both of them, and then we went into discussion and I said, well, I said, "you said we could have backup drivers," and he said "well, yeah, you could have a backup driver," and I said, "well, what I could do is do this then, hire a backup driver, you know, and then they could take over, you know,

   once I went into work." And he was like, "well, okay, you can get a backup driver, you know, this could work," and that's what it led to.

2. Carey testified at deposition that, upon signing the receipt, he thought he was signing whatever he needed to be a contractor.

3. This form was apparently the same "Contractor/Driver Information Sheet" that Plaintiff had completed.

complete. Cross completed these forms, and Carey returned them to Kelleher. Carey did not understand that his backup driver had to meet the same standards and training required of all drivers. Kelleher told Carey that the backup driver was solely Carey's responsibility since he would be working for Carey and that the "[o]nly thing we want to do is just check his application out just to make sure he fits our criteria." Kelleher did not tell Carey about a drug screen or any other requirements that Cross had to fulfill. When Carey inquired further, Kelleher specifically told Carey that nothing else was needed at the time and that it was sufficient that Cross had filled out an application.

At the February 3, 2001, meeting, Kelleher and Carey discussed the route that Kelleher intended to give Carey. Kelleher pointed out a display of the area's routes and told Carey that he was splitting up a Westerville/Worthington route and that this was the route he was going to give Carey. Kelleher said that the split probably would not occur until the end of March or early April. According to Carey, Kelleher specifically stated, "This is the route I'm going to give you."[4] Kelleher also at this time told Carey that he needed to start looking for a delivery van to purchase.

It appears that on February 23, 2001, Regional Manager/Safety Manager Paul Molnar executed a "Driver Qualification File Control Form–TSM034" approving Carey as a FedEx Home Delivery "Temp A Driver" with a start date of February 23, 2001.[5] Molnar also, on that date,

signed Carey's "Contractor/Driver Information Sheet," indicating his approval of that application.[6] By this time, Kelleher had the forms that Cross had completed. Kelleher had told Carey that he had to send everything out to the Safety Manager for approval. At some point, presumably after the approval was received, Kelleher informed Carey that "everything was a go." Carey understood this statement to mean that he was approved as an independent contractor and that his backup driver also was fully approved. Kelleher never subsequently raised the question of a backup driver or informed Carey that he needed to meet any further requirements.

Around March 1, Kelleher called Carey and told him to "hold up" on buying a van because the new route had not been approved yet. On March 1, Jackie provided Honda with her resignation, to be effective March 14, 2001. Carey told Kelleher that Jackie had submitted her resignation. Around the second week in March, Kelleher called Carey and said, "[T]hat route's coming available. You need to go ahead and get that van." During this conversation, Kelleher told Carey, "I can't approve you if you don't have the van." When Carey responded that he was going to go buy it, Kelleher replied, "That's the only thing you need to do."

On March 22, 2001, Carey purchased a van from Krieger Ford for $21,019. Both he and his wife signed the financing agreement, and he took possession of the van that day. He immediately drove the van to the terminal, where Kelleher took photographs of it. At that time, Kelleher told Carey, "It won't be long." At some point

---

4. According to his deposition testimony, Carey understood, at that time, that actually getting the route was contingent upon him meeting the obligations to be a contractor.

5. This document was actually dated March 23, 2001. Nevertheless, based on the fact that the start date on the form is indicated as

February 23, 2001, and on the fact that Molnar provided his approval of Plaintiff's application on February 23, 2001, the March date appears to be an error.

6. The notation, "Temp A" also is found in the approval section of the application form.

in late March or early April, Kelleher told Carey that the route was not yet available. While waiting for the route to become available, Carey, on March 28, 2001, entered into an agreement with Dynamex Operation East, Inc. ("Dynamex") to become an independent contractor. According to Plaintiff's deposition testimony, he agreed to perform some delivery work for Dynamex on a temporary basis in order to be able to make payments on the van. The agreement that he signed, entitled "Driver and Equipment Lease Agreement," did not assign Carey a particular route and did not require him to drive exclusively for Dynamex.

Carey worked full time for Dynamex for a few months. He would work until three or four o'clock, when he needed to leave to go to his job at Volvo. According to Carey, the agreement with Dynamex "didn't work for me because they just didn't have the business that I needed to pay for the van." He was doing runs "here and there" rather than having a route. During this time, Carey spoke regularly with Kelleher. Kelleher kept telling Carey that no route was available because business was slow and because he was waiting for approval to split the routes. Kelleher did, however, consistently attempt to convince Carey to perform temporary work for FedEx Home Delivery.[7] Carey refused to work for FedEx Home Delivery on a merely temporary basis because that amount of work would not allow him to pay for the van. In April or May of 2001, Carey started his own courier business, called "Certified Express." He used the same van for the Certified Express business.

As early as February 2001, Carey had learned of one route, the Grove City/Southwest route, coming open and had asked Kelleher about giving him that route. Kelleher discouraged Carey, telling him that he wanted Carey in the Westerville/Worthington route and that he should wait. Carey asked Kelleher about the Grove City route again in March, but Kelleher said the route was already filled.[8]

7. Carey testified at deposition as follows:
   Q. **What were your communications with Mr. Keller [sic] at that time?**
   A. I talked to Phil all the time.... I let him know what was going on on a daily basis. He knew and I told him, and he, "Well, you know, I got some temporary work. You can come in here and, you know, do some temporary work." And I said, "Phil, well, is it going to keep me busy? We got this van." "Well, no, you know, it's one day." I said, "Well, Phil, one day is not going to pay this van."
   Q. **Did Phil suggest to you that you could become a temporary driver?**
   A. No, he didn't suggest I become a temporary driver, but he wanted me to come in at his convenience and be a temporary driver, and he didn't have the work. He wants to work me one day and don't work me for two weeks.

   Q. **So what happened next?**
   A. Called Phil, you know, "Hey, man, what's going on with this route?".... "You know, maybe I can call you for a day;

   you know, maybe you can do some temporary work." I said, "Look, Phil," I said, "I don't have a problem with doing temporary work," I said, "but you can't keep calling me talking about"—and he always, he always falls into that.... He tells me about the situation. "You ready for the route?" And then he goes into, "Don, you know, I need a driver for the day." I said, "Look, man, I can't leave these people after I committed to them to come deliver for you for one day."
   Q. **"These people" being the—**
   A. Dynamex.

   .  .  .  .  .

   Q. **Well, weren't you working for Dynamex as a floater?**
   A. I was working for Dynamex as a floater, but still they depended on me to be there, you know.

8. On March 28, 2001, the Grove City route was given to John Zehender, a white male who had applied to be a contractor a month after Plaintiff.

Sometime in May or June of 2001, Kelleher called Carey and said, "Don, are you ready?" When Carey responded that he had been ready all along, Kelleher stated that another contractor, a white male named Chad Gertler, was "giving me all kinds of problems, and, you know, I don't like his attitude. I don't know if he's going to quit or I'm going to fire him first." Carey then spoke with Kelleher about what route he would get:

And I said, "Well, what about the Westerville route, man? I been waiting on that." ["]Well, that's the route." I said, "Well, what do you mean that's the route?" He said[,] "Well, you know, I know I should have told you, but I moved Chad to the Westerville route because he's then going to take over the Mansfield that we're going to[ ]—I was telling you about the Mansfield.["] I said[,] "What about Chad's route?" "I promised that to somebody." I said, "Well, what about me?" "Well, I just want to make sure that, you know, you get the Westerville route, as we had promised, but I just had to make some moves and put Chad in here, then I'm going to move Chad out to Mansfield."

Carey thus learned that Kelleher had already placed Gertler in the Westerville/Worthington route he had promised Carey. Unbeknownst to Carey, Gertler, on May 4, 2001, had given his 30 day notice to terminate his contract. Gertler did not actually work for the entire 30 days; he quit two weeks after giving his notice. For weeks after the phone conversation with Kelleher, Carey continued to call Kelleher to ask him when the route would be open. Kelleher kept responding that he did not know what Gertler was going to do. On May 21, 2001, again unbeknownst to Carey, William Bardelang, a

white male, was given a route comprised of "Westerville, Sunbury, Mt. Vernon, Galena, Columbus 43221." [9] Bardelang had applied only two weeks before—on May 7, 2001.

In late summer 2001, Carey was becoming increasingly financially desperate due to the van payments, the start up costs of his business, and the loss of Jackie's income. His contractor relationship with Dynamex ended. He started delivering packages for several companies but was unable to earn enough to make the van payments. In August or September 2001, Carey decided to sell the van. He called Kelleher and asked for help in selling the van. He also put an ad in *Trading Times*. He contacted Krieger Ford, which offered him $14,000 for the van. Carey never received any other offer for the van, and he never sold it. In the fall of 2002, the van was repossessed.

Throughout this time, Carey continued to call Kelleher to ask about the route, but Kelleher stopped returning his calls. When Carey called to ask about any progress in selling the van, he would ask about the route. Kelleher would respond that "[i]t's slow right now" and "[w]e can't get them to split these routes." Eventually, in the fall of 2001, Carey called Kelleher and expressed his anger at Kelleher for not keeping his commitment to give Carey a route:

I expressed how I felt and I let him know the situation that he put us in, and I told him, "The least you could do, the least you could do is either buy this van back or will you at least buy it from me or find someone to buy it. . . ."

**Q. What was his response during that conversation?**

"Mt. Vernon, Westerville, Johnstown, Newark, Granville, Pataskala, COLO 43202, Sunbury, Galena."

9. According to FedEx Home Delivery records, Chad Gertler, in 2000, entered into a contractor agreement to service the following route:

A. He just got quiet and kind of somber like and, you know, "I'm going to see what I can do. You know, I'm sure somebody can buy it."

After this conversation, Carey and Kelleher did not speak for several months. Finally, sometime in early 2002, Carey called Kelleher to see if he had anything available. In May 2002, when Carey called to ask about possible routes, Kelleher responded, "Well, you know what? Come on in. You know, there's going to be four routes opening within the next, I don't know, month or so." Carey then drove to see Kelleher that day. When he met with Kelleher that day, Carey was told that he would have to go through the entire qualification process again. Thus, on May 10, 2002, Carey completed another "Contractor/Driver Information Sheet." He also executed another set of forms, including drug screen authorizations and the form that allows FedEx Home Delivery to verify employment references. Additionally, Carey filled out a "Contractor Vehicle Information" form, confirming his ownership of the van. Carey, when requested, had the van inspected at a shop. Kelleher told him that "down the road," he might have the modify the van to make it a bubble top.

Carey recognized that he would still need an approved backup driver before obtaining a contract, so he arranged for a backup driver, Jerry Melson, also an African American. Melson filled out the "Contractor/Driver Information Sheet," and Carey returned the form to Kelleher on May 20, 2002. Melson also executed a "FedEx Home Delivery MVR Request," which Carey likewise delivered to Kelleher on May 20. On May 21, 2002, Carey faxed Kelleher a release signed by Melson permitting FedEx Home Delivery to perform a background check. On May 22, FedEx Home Delivery ran Melson's traffic citation check. And on August 9, 2002, Melson completed a drug screen and a physical examination. Kelleher interviewed Melson over the phone, but he never informed Melson of anything Melson needed to do to become a qualified FedEx Home Delivery driver. Instead, he asked Melson questions such as, "Do you trust Don to pay you?"

On June 25, 2002, Carey's criminal background check was run, and he was approved for hiring. Carey's MVR report, dated June 11, 2002, listed an outstanding violation that needed clarification. Carey explained and corrected the violation, and on July 17, 2002, his safety file was approved. Carey completed a new drug test and medical examination, since the previous results had expired. On July 18, 2002, Carey, on the "Home Delivery Driver Qualification File Control Form," form TSM034H, was approved by Molnar as a "P & D Contractor."

Carey was eager to proceed with the application process as rapidly as possible. He believed, however, based on his previous experience with the process and how quickly it moved, that Kelleher was delaying the process. Instead of being just a day, the required safety class was a week long. Kelleher told Carey that no safety class was available and that he could not schedule Carey for a class until June 21, 2002. Carey offered to go to Cincinnati for the class, or to do whatever was necessary to be able to take the class earlier. When Kelleher called Carey in June to tell him about the safety class on June 21, he also told him, for the first time, that Melson would have to attend the safety class as well. Kelleher informed Carey, however, that the June 21 class was full and that Melson would not be able to attend then. While Carey did attend the June 21 safety class, Melson never attended a safety class. Melson called Kelleher at least three times during the summer to ask

when he could get into a class. Carey also asked Kelleher several times per week when Melson could get into a class. Kelleher always replied that he had no slots available and that he was waiting for the next class in the area. In addition to not attending the safety class, Melson's safety file was never approved since his MRV report revealed a motor vehicle accident that was never clarified or explained.

During the summer of 2002, Kelleher told Carey that he needed him to work as a part time driver with Ray Hicks, an African American contractor, until Carey's route became available. When Carey spoke to Hicks, he discovered that Kelleher had told Hicks that Carey would be Hicks's employee. Angry, Carey confronted Kelleher, who attempted to reassure him: "Don't even worry about that. You know, I got your route coming. You know, you're [sic] route's going to be on the way." The route that Kelleher was promising Carey—which he told Carey had already been approved—was going to be in the "downtown area or up in the northern area up in here, like up in the city." After driving for Hicks for awhile, it became apparent that Hicks did not have enough work for Carey. Carey therefore, on July 25, 2002, posted a notice on the terminal bulletin board that he would drive for any contractor up through 1:30 p.m.[10]

In late July 2002, Carey confronted Kelleher about his broken promises: "I told him off, big time, after work, and I told him off because I was pissed because he's promising people routes and putting people on other routes and he ain't coming

through for me . . . ." [11] Kelleher told Carey that he needed to "just hang on." When Carey told his wife about the conversation, she became upset and called Kelleher herself. When Kelleher was not responsive to her questions, she demanded to speak to his supervisor. Kelleher never told either Carey or his wife that the reason Carey had not received a route was his lack of a qualified backup driver. Kelleher finally gave Jackie the name and phone number of Ken Kibbler, the Regional Manager. Jackie then called Kibbler. On August 13, 2002, she faxed Kibbler the current registration for the delivery van. In response to Jackie's phone call, Kibbler asked for Carey to call him. During Carey's phone call, Kibbler asked Carey to meet with him as soon as possible.

On August 17, 2002, Carey met with Kibbler. At this meeting, Kibbler "apologized for what happened . . . and he wanted to make right by me and, you know, give me a route, and he promised me that I was going to get this route, a new route's going to open up, well, 16 or something of that nature, and it was going to be in Lancaster . . . ." Kibbler also told Carey, however, that in order to deliver on this route he would need a larger van—a van with a bubble top. Carey expressed to Kibbler not only his unwillingness, but his inability, due to bad credit from the other van, to purchase a larger van. Carey asked Kibbler to give him something that he could do with his current van, but Kibbler refused, telling Carey to go home and talk it over with his wife. Kibbler never told Carey that he needed a qualified back-

---

**10.** Plaintiff used the cut-off time of 1:30 to ensure that he would be able to be at Volvo by 5:00 p.m. each day. He wanted to leave himself plenty of time, figuring that he could be delivering something far outside the city and that jobs often take longer than expected.

**11.** In late June or early July 2002, a white contractor, John Zehender, walked off of the

job without giving any notice. Carey saw Zehender leave and went to Kelleher to ask about getting Zehender's route. Kelleher informed Carey that he had already promised the route to someone still in safety school. The only potential contractors in the pipeline at the time, other than Carey, were white.

up driver. After discussing the situation with his wife, Carey concluded that he had already done everything FedEx Home Delivery had asked, but with no results, and that he could not afford to buy a larger van based on additional FedEx promises. After deciding not to pursue the Lancaster route, Carey and his wife contacted an attorney. Neither spoke to Kibbler again, and the Lancaster route ultimately was filled by a white male, Robert Lane, on September 20, 2002.

On October 23, 2002, Plaintiff filed this action. In his Amended Complaint, Plaintiff seeks recovery based on (1) race discrimination in violation of 42 U.S.C. § 1981; (2) breach of contract; (3) promissory estoppel; and (4) fraud. Plaintiff seeks (1) an award of past and future loss of income and benefits; (2) compensatory and punitive damages; (3) an award of past and future benefits of the agreement; and (4) an order requiring Defendant to place him on one of the two delivery routes he was promised, or on an equivalent route.

This matter is now before the Court on Defendant's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant contends that not only was there never any agreement between the parties, but that Plaintiff was never qualified—pursuant to either the Motor Carrier Act or the FHD Safe Driving Program—to serve as a contractor since he never had a qualified backup driver.[12] Defendant notes that Plaintiff was approved as a driver but was never approved as an independent contractor for this reason, and that there is no evidence that any FedEx Home Delivery contractor was ever permitted to forego the requirements of the Motor Carrier Act

or the FHD Safe Driving Program. Defendant further notes that, of 15 new drivers it contracted with in 2001, four were African Americans. In 2002, it contracted with one African American female driver; furthermore, no routes were available for any contractor between June 24, 2002 and September 20, 2002.

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *accord Moore v. Philip Morris Cos.,* 8 F.3d 335, 340 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

---

**12.** Kelleher testified at deposition that the reason Carey did not receive a route in either 2001 or 2002 was that he did not have "a qualified backup driver that had been ap-

proved by our safety maintenance manager." Kelleher further testified that he would have given Carey Gertler's route in 2001 if Carey had had a backup driver.

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir.1994). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995); *see also Matsushita*, 475 U.S. at 587–88, 106 S.Ct. 1348 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

## IV. ANALYSIS

### A. Race Discrimination— 42 U.S.C. § 1981

Defendant contends that Plaintiff cannot establish a prima facie case of race discrimination under the *McDonnell Douglas* framework both because he was not qualified for the position and because he cannot demonstrate that he was treated differently than similarly situated white contractors. Defendant asserts that Plaintiff was not qualified due to his failure at any time to secure a qualified backup driver. Defendant further contends that, even if Plaintiff could state a prima facie case of discrimination, he still cannot establish that Defendant's stated reason for not hiring him—the refusal to put an unqualified driver on the road in violation of federal law—was anything other than a legitimate business reason. Defendant argues that there is no evidence that any contractor was ever allowed to bypass the requirements of the Motor Carrier Act. Defendant also maintains that FedEx Home Delivery was at all times willing to work with Plaintiff to help him secure a route and that, ultimately, it was Plaintiff who walked away.

Plaintiff contends that under the test announced in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), he need only establish that the adverse action was motivated at least in part by race in order to place the burden on Defendant to prove that the same decision would have been made in the absence of the illegitimate factor. Plaintiff maintains that he has made this showing. Plaintiff also argues, however, that even under the familiar *McDonnell Douglas* framework, he has established that he was qualified for the position and that his lack of a qualified driver is attributable to the discriminatory actions of Defendant rather than to any failing on his part. Plaintiff asserts that his qualification for the position is evidenced by the fact that Defendant's own management approved him to be a contractor.

Section 1981 prohibits discrimination based on race. 42 U.S.C. § 1981. In general, the same standards apply to claims brought pursuant to § 1981 as to claims brought under Title VII of the Civil Rights Act of 1964 ("Title VII"). *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Mitchell v. Toledo Hosp.*, 964 F.2d

577, 582 (6th Cir.1992). Since the Supreme Court decision in *Desert Palace*, however, federal courts nationwide have been struggling to determine whether the standards to be applied in a Title VII action are the same as they have been since the Supreme Court decided *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

### 1. The Proper Standard

*McDonnell Douglas* and its progeny set forth a tripartite scheme of proof in discrimination cases. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 342 (6th Cir.1997) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). First, a plaintiff must prove a prima facie case, thereby creating a presumption of discrimination. *Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394, 402 (6th Cir.1999). Assuming the plaintiff does not have credible, direct evidence of discriminatory intent, *Terbovitz v. Fiscal Court of Adair County*, 825 F.2d 111, 114–15 (6th Cir.1987), the plaintiff must present circumstantial evidence to demonstrate the following: (1) that he is a member of a protected class; (2) that he suffered from an adverse action; (3) that he was qualified for the position; and (4) that he was treated differently from similarly situated members of the unprotected class, or that the position at issue was filled by a member of the unprotected class. *Alexander*, 177 F.3d at 402–03; *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995).

Second, if the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse action. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *Alexander*, 177 F.3d at 403. Third, after the defendant has met this burden, "the plaintiff must produce suffi-

cient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). In some cases, the plaintiff's evidence establishing the prima facie case also may be sufficient to meet one or more of the elements necessary to rebut the defendant's proffered nondiscriminatory reasons. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). While it is permissible for a trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation, proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination. *Id.* at 147, 120 S.Ct. 2097. The mere rejection of the employer's proffered justification does not compel judgment for the plaintiff. *Id.* at 146–47, 120 S.Ct. 2097 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 519, 524, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

*Desert Palace* does not overtly impact the *McDonnell Douglas* framework. Indeed, the unanimous decision does not once mention *McDonnell Douglas*. What it does is interpret the Civil Rights Act of 1991 (the "1991 Act"), which amended Title VII. Based on its reading of the statute, the Court held that a plaintiff did not need to present direct evidence of discrimination in order to obtain a mixed motive jury instruction under 42 U.S.C. § 2000e–2(m); rather, the presentation of circumstantial evidence could suffice. The Court stated that in order to obtain such an instruction,

the plaintiff "need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" *Desert Palace*, 539U.S. at 101, 123 S.Ct. 2148 (quoting § 2000e–2(m)). Before *Desert Palace*, there was a clear dichotomy between single motive discrimination cases, which used the *McDonnell Douglas* framework and required, ultimately, a finding that race, etc., was the single motive behind an adverse action, and mixed motive discrimination cases, where a plaintiff could establish that race, etc., was merely one motivating factor in the adverse action. Mixed motive analyses tended to be of little utility to plaintiffs because direct evidence was necessary to prove a case under that theory, and the vast majority of employment discrimination cases, like the case sub judice, involve only circumstantial evidence.

Now that circumstantial evidence may be used to establish a case of discrimination under a mixed motive theory, the question becomes whether all discrimination cases are now somehow mixed motive cases, and whether the *McDonnell Douglas* paradigm continues to provide a useful methodology for courts to consider these cases. The Court does not agree with those courts and commentators that have found that, after *Desert Palace*, the *McDonnell Douglas* framework has ceased to exist entirely. *See, e.g., Dare v. Wal–Mart Stores, Inc.,* 267 F.Supp.2d 987 (D.Minn.2003) (leading case); Jeffrey A. Van Detta, *"Le Roi est Mort; Vive le Roi!": An Essay on the Quiet Demise of* McDonnell Douglas *and the Transformation of Every Title VII Case After* Desert Palace, Inc. v. Costa *into a "Mixed–Motives" Case,* 52 Drake L.Rev. 71 (2003); William R. Corbett, McDonnell Douglas, *1973–2003: May You Rest in Peace?,* 6 U. Pa. J. Lab. & Emp. L. 199 (2003). *Dare,* decided a mere four days after *Desert Palace,* represents a radical approach that other courts have declined to adopt. Though *Dare* is often discussed, very few cases accept *Dare's* rationale. Indeed, even other judges in the District of Minnesota have declined to follow *Dare. E.g., Walker v. Northwest Airlines, Inc.,* No. Civ. 00–2604(MJD/JGL), 2004 WL 114977, at *5 (D.Minn. Jan.14, 2004); *Brown v. Westaff (USA), Inc.,* 301 F.Supp.2d 1011 (D.Minn.2004). Any legitimacy that *Dare* might have had has been severely undermined by *Raytheon Co. v. Hernandez,* 540 U.S. 44, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003), a post-*Desert Palace* case in which the Supreme Court itself, without mentioning *Desert Palace,* applied the *McDonnell Douglas* framework. *See also Brown v. Packaging Corp.,* 338 F.3d 586 (6th Cir. 2003) (holding, in case decided shortly after *Desert Palace,* that a district court has discretion to include the *McDonnell Douglas* burden shifting framework in jury instructions).

This Court also, however, does not agree with those courts that have held that *Desert Palace* changed nothing with regard to *McDonnell Douglas* and its progeny. *E.g., Herawi v. Ala. Dep't of Forensic Scis.,* 311 F.Supp.2d 1335 (M.D.Ala.2004); *Winter v. Bank of Am., N.A.,* No. Civ. A.3:02–CV–1591–L, 2003 WL 23200278, at *3 (N.D.Tex. Dec.12, 2003). All that stands between *Desert Palace* and a change in the *McDonnell Douglas* framework is a footnote in which the Court states, "This case does not require us to decide when, if ever, § 107 [42 U.S.C. § 2000e–2(m)] applies outside of the mixed motive context." *Desert Palace,* 539 U.S. at 94 n. 1, 123 S.Ct. 2148. This footnote appears to be a strategically placed fig leaf designed to obscure the otherwise clear implications of *Desert Palace's* reading of § 2000e–2(m).

What this Court does find persuasive is the thoughtful and thorough analy-

sis provided in *Dunbar v. Pepsi–Cola Gen. Bottlers,* 285 F.Supp.2d 1180 (N.D.Iowa 2003). The court in *Dunbar* held that the *McDonnell Douglas* framework need only be modified in light of *Desert Palace.* Relying on *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), and on the 1991 Act, the court found the only flaw in the *McDonnell Douglas* framework to be in the third stage, where courts have framed the issue in terms of only two alternatives: "[E]ither the defendant's proffered explanation for its conduct was true, resulting in victory for the defendant, or the defendant's proffered explanation was a false pretext for discrimination, resulting in victory for the plaintiff." *Dunbar,* 285 F.Supp.2d at 1196. Instead, the court held, once the defendant has produced a legitimate, nondiscriminatory reason for its conduct,

> the plaintiff must prove by the preponderance of the evidence either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only *one* of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive alternative).

*Id.* at 1197–98 (citation omitted). The court went on to note that if the plaintiff prevails under the mixed motive alternative, the defendant then has the opportunity to limit the remedies available to the plaintiff to injunctive relief, attorney's fees, and costs—*i.e.,* to escape liability for damages—by utilizing the affirmative defense stated in 42 U.S.C. § 2000e–5(g)(2)(B). *Id.* at 1198. In order to take advantage of this defense, the burden shifts back to the

defendant to prove that it " 'would have taken the same action in the absence of the impermissible motivating factor.' " *Id.* (quoting 42 U.S.C. § 2000e–5(g)(2)(B)). Several cases have followed *Dunbar's* lead. *See, e.g., Lloyd v. City of Bethlehem,* No. Civ.A. 02–CV–00830, 2004 WL 540452, at \*4–5 (E.D.Pa. Mar.3, 2004); *Walker,* 2004 WL 114977, at \*5; *Brown,* 301 F.Supp.2d at 1016–18; *Rishel v. Nationwide Mut. Ins. Co.,* 297 F.Supp.2d 854, 860–66 (M.D.N.C.2003).

The Sixth Circuit has not specifically addressed the question of whether the *McDonnell Douglas* framework should be modified in light of *Desert Palace.* Indeed, all circuit courts seem thus far to have shied away from the issue. *See, e.g., Rowland v. Am. Gen. Fin., Inc.,* 340 F.3d 187, 192 n. 4 (4th Cir.2003) ("In [*Desert Palace* ] the Court refused to decide 'when, if ever, [42 U.S.C. § 2000e–2(m) ] applies outside of the mixed-motive context,' " and, therefore, the Fourth Circuit "decline[s] to do so as well.").

There has been one case in this Court to address *Desert Palace's* impact. In *Gover v. Speedway Super America, LLC,* 284 F.Supp.2d 858 (S.D.Ohio 2003), decided one month after *Desert Palace,* Chief Judge Rice, in a footnote, found *Desert Palace* to be inapposite to the case before him because "Plaintiff has not asserted that this is a mixed-motive case, nor is this litigation at the jury instruction stage. Moreover, this Court has not required Plaintiff to present direct evidence in order to avoid summary judgment." *Gover,* 284 F.Supp.2d at 865 n. 1. This case is distinguishable from *Gover* because, here, Plaintiff has alleged, at least as an alternative basis for decision, that this case involves a mixed motive.[13] Similarly, the

---

13. Even if Plaintiff had not so alleged, the Court is not inclined to condition the applicability of *Desert Palace* on whether or at which stage of the litigation the plaintiff claims a

mixed motive. Circuit Judge Pregerson, dissenting in part in *Liu v. Amway Corp.,* 347

fact that litigation is not at the jury instruction stage is not determinative. Not only is the standard for summary judgment the same standard as for a directed verdict, but if a plaintiff is going to be allowed a jury instruction on a given theory, then it is logical to permit him to survive summary judgment on that theory.

Defendant argues that *McDonnell Douglas* should not be modified in this case because it is a § 1981 case instead of a Title VII case. Defendant's argument is a valid one because the decision in *Desert Palace* was explicitly based upon the language of the 1991 Act. *See Bolander v. BP Oil Co.*, No. 3:02CV7341, 2003 WL 22060351, at *3 (N.D.Ohio Aug.6, 2003) (stating, in case brought pursuant to Ohio's age discrimination statutes, that the mixed motives rationale and *Desert Palace* do not apply to age discrimination cases). Upon consideration of the merits of this position and the weight of authority, however, the Court finds the distinction between § 1981 and Title VII not to be outcome determinative on this point. *See Walker*, 2004 WL 114977, at *6 (finding *Desert Palace* to apply equally to § 1981 as to Title VII since same standards are applied to both claims and since § 1981, like Title VII, does not contain language directing courts to weigh direct evidence more heavily than circumstantial evi-

dence); *see also Lloyd*, 2004 WL 540452 (applying *Dunbar's* modified *McDonnell Douglas* scheme in ADEA case); *Brown*, 301 F.Supp.2d at 1016–18 (applying *Dunbar* modification of *McDonnell Douglas* in § 1981 case); *Rishel*, 297 F.Supp.2d 854 (applying *Dunbar's* modified *McDonnell Douglas* scheme in ADA and ADEA case, assuming, without deciding, that *Desert Palace* applies to age discrimination cases under ADEA).

For the foregoing reasons, the Court will analyze this case pursuant to the modified *McDonnell Douglas* framework proposed in *Dunbar*.

### 2. Application of the Standard

■ As the first step in even the modified *McDonnell Douglas* framework, Plaintiff must establish a prima facie case based on the four factors enunciated *supra*. Defendant apparently concedes that Plaintiff is a member of a protected class and that he was subjected to an adverse action. Defendant primarily argues that Plaintiff was not qualified to obtain a route and secondarily argues that Plaintiff was not treated differently than any other similarly situated applicant. It is true that Plaintiff was not ever qualified to serve as an independent contractor because he did not ever have a backup driver that had taken the steps to be qualified as a driver by FedEx

---

F.3d 1125, 1140 n. 3 (9th Cir.2003), explained as follows:

The theory on which a plaintiff intends to rely is often not identified at the outset of the case. *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 856 (9th Cir.2002) (en banc) ("As the Supreme Court has observed, a case need not be characterized or labeled at the outset. Rather, the shape will often emerge after discovery or even at trial."), *aff'd*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84[] (2003); *Washington v. Garrett*, 10 F.3d 1421, 1432 (9th Cir.1993) (recognizing disparate treatment claim though complaint did not specify a particular theory of discrimination); *Sischo–Nownejad [v. Merced*

*Cmty. Coll. Dist.*], 934 F.2d [1104,] 1110 n. 8 [(9th Cir.1990)] ("A plaintiff need not choose between a single motive and mixed motive theory at the beginning of the case"). In fact, a plaintiff will rarely identify the theory as early as summary judgment. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 286 n. 12, 109 S.Ct. 1775, 104 L.Ed.2d 268[] (1989) ("Indeed, we expect that plaintiffs often will allege, in the alternative, that their cases are both [mixed and single motive].... At some point in the proceedings, of course, the District Court must decide whether a particular case involves mixed motives.").

Home Delivery. Plaintiff does not now dispute that his backup driver was required to meet the standards outlined in the Motor Carrier Act, its attendant regulations, and the FHD Safe Driver Program. He does, however, offer two arguments in response.

Plaintiff first argues that, at the prima facie stage, the Court may not consider the alleged nondiscriminatory reason for the adverse action but that any consideration of the nondiscriminatory reason instead is reserved for the pretext stage. Plaintiff cites to *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir.2003), for this proposition. *Wexler*, however, is distinguishable. In *Wexler*, the court held that, in considering whether the plaintiff had met his employer's legitimate expectations, the district court should not have relied on evidence that sales at the store managed by the plaintiff were declining. While it was undisputed that sales had in fact declined, the plaintiff did dispute whether that fact was sufficient to cause him to be unqualified for the position.[14] In explicating what evidence is relevant to the determination of whether a plaintiff is qualified for purposes of a prima facie case, the court stated:

> At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job.... The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the *minimum objective criteria* required for employment in the relevant field.

*Wexler*, 317 F.3d at 575–76 (second emphasis added).

Here, the qualification at issue was an objective one. Not only is Plaintiff's lack of the particular qualification undisputed, but it is undisputed that procurement of a qualified backup driver was in fact a qualification—even if Plaintiff did not know it at the time. The Agreement clearly specifies that backup drivers are required to meet all of the same standards as contractors, and these standards are not subjective. In short, Plaintiff has not established that his qualifications were "at least equivalent to the minimum objective criteria required for employment" as a FedEx Home Delivery contractor.

Plaintiff's second argument is more persuasive. He argues that an employer cannot create the condition that leads to an adverse action and then use that condition against the plaintiff. In *Portis v. First National Bank*, 34 F.3d 325 (5th Cir.1994), the bank had allegedly denied an African American employee secretarial and other support services. It then demoted her based on poor performance that allegedly resulted from the discriminatory denial of these services. The court held, "[w]e cannot say that a reasonable jury would not under any circumstances find that Portis' poor performance was a product of FNB's earlier discriminatory deprivation of a secretary. Given that standard, Portis has adduced sufficient evidence of intentional discrimination to warrant presentation of her case to a jury." *Portis*, 34 F.3d at 329; *see also Shrout v. Black Clawson Co.*, 689 F.Supp. 774, 781 n. 6 (S.D.Ohio 1988) ("We agree with those courts which have refused to permit employers to base disparate treatment of an employee upon his or her diminished work performance when the employer's acts were a direct cause of that decrease."); *Weiss v. United States,*

---

**14.** According to the plaintiff, the decline in sales was due to factors other than his performance.

595 F.Supp. 1050, 1057 (E.D.Va.1984) (holding, where employee's performance was poor as a result of difficult working conditions created by employer, that poor performance was not legitimate basis for employee's termination).

This case is similar to *Portis*. A reasonable jury could find that Plaintiff was not qualified because of Kelleher's discriminatory failure, in 2001, to inform Plaintiff that his backup driver must meet certain qualifications and Kelleher's discriminatory delays in the approval process, in 2002. While the requirements for backup drivers were listed in the Agreement, a jury could find that the reason Plaintiff was not aware of these requirements was because Kelleher told him that he did not need to read the Agreement. Because Plaintiff's failure to become qualified might well have been the direct result of discriminatory conduct on the part of Defendant, the Court finds that Plaintiff has met the qualification element of his prima facie case.

Plaintiff also has met the fourth element of a prima facie case. While it is difficult to find an exact counterpart with whom to compare Plaintiff, such a comparison is not necessary here because Plaintiff has established that the routes at issue were given to white applicants. *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir.1995) (plaintiff need only demonstrate that position at issue was filled by a member of the unprotected class). Specifically, the Westerville/Worthington route that Kelleher promised Plaintiff in 2001 was apparently given first to Chad Gertler and then to William Bardelang, both of whom are white. Similarly, in 2002, John Zehender's route was apparently given to a white applicant and the Lancaster route that Kibbler offered to Plaintiff was ultimately given to a white applicant.

■ Since Plaintiff has established a prima facie case of racial discrimination, the next question is whether Defendant has stated a legitimate, nondiscriminatory reason for failing to provide Plaintiff with a delivery route. Defendant has provided such a reason: Plaintiff needed a backup driver and did not at any point have a backup driver who had met all of the requirements of federal law and the FHD Safe Driving Program. The next inquiry, then, is whether a reasonable jury, considering all of the evidence, could determine that Defendant's proffered reason is false and that Defendant failed to give Plaintiff a route because of his race. A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers for an adverse action "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir.2000). Plaintiff's argument falls into the second category.

■ Plaintiff has the following evidence to support an inference that Defendant's proffered reason for failing to give him a route is false, and that the true motivation was his race:

(1) Kelleher never told Plaintiff or his wife, through the course of numerous conversations on the subject, that the reason Carey had not yet been given a route was that he did not have a qualified backup driver; [15]

(2) In all of 2001, Kelleher never mentioned getting his backup driver properly qualified as a step that Plaintiff needed to take, stating instead that "everything was

---

**15.** *See Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir.1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.")

a go" and that purchasing a van was all that Plaintiff needed to do;

(3) Kibbler never told Plaintiff or his wife that Plaintiff needed to make sure his backup driver was qualified before he could get a route;

(4) Kelleher's question to Melson regarding whether he trusted Carey to pay him has nothing to do with Melson's qualifications as a backup driver and, instead, evinces a distrust of Carey that could relate to his race;

(5) Kelleher's apparent delay tactics throughout 2001 and 2002 suggest an unwillingness to contract with Plaintiff that goes beyond the mere failure to meet some technical requirement—especially when that failure was easily remediable;

(6) Kelleher's dishonesty both in putting Gertler in the Westerville route without telling Plaintiff and in telling Plaintiff he was waiting on Gertler when Gertler had already left FedEx suggests both a dishonesty in Kelleher's other statements and that Kelleher had a compelling reason for not wanting to contract with Plaintiff even if Plaintiff did obtain a qualified backup driver; and

(7) Kelleher apparently provided certain white contractors with routes in a much more expedient manner than he provided Plaintiff with a route.[16]

This evidence, taken together, is sufficient to permit a reasonable jury to conclude that Defendant's proffered reason is pretextual and that the true reason for the decision was Plaintiff's race. Because Plaintiff has made this showing, he has, *a fortiori*, provided sufficient evidence to survive summary judgment based on race being one motivating factor in the decision not to give him a route. Defendant's Motion for Summary Judgment is therefore **DENIED** as to Plaintiff's § 1981 claim.

### B. Breach of Contract

Defendant contends that Plaintiff cannot succeed on his breach of contract claim because there was no meeting of the minds. Defendant asserts that even if FedEx Home Delivery did make a contractual offer to Plaintiff, that offer was contingent upon Plaintiff's ability to secure a qualified backup driver. Since he never did so, there was no legal acceptance of the offer. Alternatively, Defendant argues that, even if there was a contract, Defendant's duty of performance was contingent upon a condition precedent that was never met: a qualified backup driver. According to Defendant, Plaintiff even agreed, at deposition, that any contract was conditional upon his obligation to secure a qualified backup driver.[17] Since he failed to meet this condition, the contract never became operative.[18]

---

16. The most egregious instance of this phenomenon was that William Bardelang took over the Westerville part of Gertler's route only two weeks after submitting his application, and before Kelleher even told Carey that Gertler had quit.

17. At his deposition, Carey testified that he knew the backup driver was solely his responsibility but that the driver needed to meet Defendant's criteria.

18. As an additional argument, Defendant maintains that since both "Driver Qualification File Control Forms" indicate a contract

term of two years, Plaintiff's claim must fail under the Statute of Frauds, O.R.C. § 1335.05. Not only is it not clear that the "2-Year" on these exhibits refers to a contract term (rather than how often the physical examination must be renewed), but these forms *are not the contracts.* . It is nonsensical to say that a check mark on a form that does not even purport to be a contract can transform whatever contract existed from a contract for an indefinite term to a contract that may not be performed within one year. *See generally Sherman v. Haines*, 73 Ohio St.3d 125, 652 N.E.2d 698 (1995) (explaining application of Ohio's Statute of Frauds).

Plaintiff contends that a unilateral contract existed. Plaintiff argues that Kelleher's promise to Carey—that if Carey would purchase a van and hold himself in readiness to perform as a contractor, Kelleher would assign him a route—amounted to an offer that was accepted by Carey's performance in purchasing the van. According to Plaintiff, his purchase of the van was consideration for the promise. Plaintiff also seems to make a waiver argument: "When Kelleher told Mr. Carey that his application was a 'go' and that no more need be done, any condition precedent was satisfied."

■■ To prove the existence of a contract, a plaintiff must establish the existence of (1) an offer; (2) an acceptance; and (3) consideration. *Lake Land Employment Group v. Columber,* 101 Ohio St.3d 242, 804 N.E.2d 27, 31 (2004). Further, the plaintiff must demonstrate that there was a "meeting of the minds" between the parties and that the essential terms of the contract are definite. *Alligood v. Procter & Gamble Co.,* 72 Ohio App.3d 309, 594 N.E.2d 668, 669 (1991). For a meeting of the minds to occur, the parties must have "a distinct and common intention which is communicated by each party to the other." *Cohen & Co. v. Messina,* 24 Ohio App.3d 22, 492 N.E.2d 867, 870 (1985). In a unilateral contract, the promisor's offer is accepted by the promisee's performance, rather than by a return promise to perform. *Frick v. Univ. Hosps.,* 133 Ohio App.3d 224, 727 N.E.2d 600, 603 (1999). When the promisee's performance is executed, an enforceable contract is created. *Id.*

■ Plaintiff here cannot establish the existence of a unilateral contract; rather, all that existed was a gratuitous promise with no consideration. "Consideration induces the promise of the promisor, is bargained for, and results in a benefit to the promisor or a detriment to the promisee which is reasonably understood by the parties as the consideration for the promise." *Carlisle v. T & R Excavating, Inc.,* 123 Ohio App.3d 277, 704 N.E.2d 39, 45 (1997). Plaintiff's purchase of the van clearly resulted in a detriment to him and arguably was bargained for. It did not, however, induce Defendant's promise to give Plaintiff a route. *See Jones v. E. Ctr. for Cmty. Mental Health, Inc.,* 19 Ohio App.3d 19, 482 N.E.2d 969, 973 (1984) ("The detriment must induce the promise. In other words the promisor must have made the promise because he wishes to exchange it at least in part for the detriment to be suffered by the promisee.") (quoting Calamari & Perillo, *The Law of Contracts* § 2–13, at 43 (2d ed.1977)), *overruled in part on other grounds, Stites v. Napoleon Spring Works, Inc.,* No. F–96–002, 1996 WL 660655 (Ohio Ct.App. Nov. 15, 1996). Rather than Plaintiff's purchase of the van inducing Defendant to offer to give him a route, the situation here is more akin to the example of a rich man offering to a poor man that, if the poor man will go around the corner to a clothing store, the rich man will let him buy a coat on his credit:

> This is deemed a conditional gratuitous promise because, even though the poor man's walk to the store may be induced by, and taken in reliance on, the promise, it would be unreasonable for either man to understand the walk to the store as "consideration" or as the price of the promise. Rather, it would bring no benefit to the rich man, and would obviously be for the purpose of enabling the poor man to receive the gift of a coat.

*See Carlisle,* 704 N.E.2d at 45 n. 1 (explaining example found in Williston, *Contracts* § 7:18, at 348–52 (4th ed.1992)).

Because Plaintiff has established the existence merely of a conditional gratuitous promise rather than of an enforceable uni-

lateral contract, Defendant's Motion is GRANTED as to Plaintiff's breach of contract claim.[19]

### C. Promissory Estoppel

Defendant contends that Plaintiff cannot establish any of the elements of promissory estoppel: (1) Plaintiff cannot point to a clear, unambiguous promise of a contractor position, especially because any such promise was contingent upon Plaintiff meeting certain requirements; (2) there was no reasonable and foreseeable reliance because any oral promises were contradicted by clear and unequivocal terms in a written document; and (3) Plaintiff did not suffer any injury based on his alleged reliance because there is no evidence that he would not have purchased the van but for FedEx Home Delivery and because his claims of lost profits must be supported by evidence that he declined employment with another company because of the promises made.

Plaintiff counters that the only document he was asked to sign for was not the Agreement, but the document "Becoming a QHD Pickup and Delivery Contractor," which says nothing about the need for any formal contract in order to have an enforceable agreement with FedEx Home Delivery and says nothing about the need for a contractor to have a qualified backup driver. Based on Kelleher's representations, Plaintiff thought that he did not need to read any of the papers given to him, including the Agreement, until a later time. In fact, Plaintiff thought that the paper he was signing was his acknowledgment of the agreement—he thought that the document itself was the contract. Plaintiff contends that based on Kelleher's statement that everything was a "go," he reasonably believed that he had a deal with FedEx Home Delivery. Moreover, Plaintiff asserts that even if he had read the Agreement, there was nothing in the Agreement to inform the average reader that Kelleher could not fulfill his promise of a route. Plaintiff maintains that he reasonably assumed that FedEx Home Delivery had vetted his application and either determined that he was qualified at the time or could be qualified later.

Under the doctrine of promissory estoppel, " '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee . . . and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' " *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150, 154 (1985) (quoting *Restatement (Second) of Contracts* § 90 (1981)). The elements necessary to establish a claim of promissory estoppel are (1) a promise, clear and unambiguous in its terms; (2) relied upon by the party to whom the promise made; (3) that the reliance be reasonable and foreseeable; and (4) that the party claiming estoppel be injured by the reliance. *Cohen & Co. v. Messina*, 24 Ohio App.3d 22, 492 N.E.2d 867, 872 (1985). The doctrine of promissory estoppel facilitates the enforcement of promises by supplying the element of consideration when necessary to prevent injustice. *Uebelacker v. Cincom Sys., Inc.*, 48 Ohio App.3d 268, 549 N.E.2d 1210, 1217 (1988). "The import of the promise, *i.e.*, what action or forbearance the promisor reasonably should have expected of the promisee, and whether the action or forbearance flowing from the promise was reasonable are generally questions of fact for the jury." *Id.* (citing *Mers*, 483 N.E.2d at 155).

Plaintiff has established a claim of promissory estoppel as to his pur-

---

**19.** Because the Court concludes that there was no contract, the Court need not consider any of the parties' arguments related to an alleged condition precedent.

chase of the van. After apparently receiving approval of Plaintiff's application from the Safety Manager, Kelleher told Carey that "everything was a go." After telling Plaintiff to "hold up" on buying a van, Kelleher then, a couple weeks later, called Plaintiff to tell him "to go ahead and get that van" because the route was coming open and Plaintiff could not be approved until he bought the van. In the context of Kelleher's statements regarding the particular route that he was going to give Plaintiff, a reasonable jury could find the existence of a clear and unambiguous promise to install Plaintiff as a contractor and to give him the Westerville/Worthington route.[20] Taking the evidence in the light most favorable to Plaintiff, Plaintiff relied upon that promise in purchasing the van. He bought the van about a week after the conversation with Kelleher in which Kelleher instructed him to buy a van. The fact that he began to do some delivery work for Dynamex six days after purchasing the van does not destroy Plaintiff's claim in light of his deposition testimony that he only agreed to do the work for Dynamex on a temporary basis in order to be able to make payments on the van until FedEx Home Delivery provided him with the promised route. Plaintiff's action in buying the van represented reasonable and foreseeable reliance upon Kelleher's promise.[21] Not only did Kelleher know that the likely result of his statements would be for Plaintiff to buy a van, but he actually instructed Plaintiff to do so. Plaintiff also has adduced evidence

**20.** Plaintiff argues that a promise cannot serve as the basis for a promissory estoppel claim if it is a contingent promise. Since promissory estoppel is essentially a substitute for a contract claim, the existence of conditions is relevant. On a promissory estoppel claim, however, it is sufficient for a plaintiff to establish that it was his reliance on assurances provided by the promisor that caused him not to meet any conditions. In other words, all of the representations made by the promisor should be considered as a whole. Here, Plaintiff succeeds in making such a showing based on Kelleher's representations that Carey need not read the Agreement. Because, as per Kelleher's advice, Plaintiff did not read the Agreement, he was unaware of the condition that he needed to meet.

**21.** Defendant's argument that any reliance by Plaintiff was unreasonable in light of the clear language of the Agreement is not persuasive. The reasonableness of reliance normally is a question of fact, *Uebelacker,* 549 N.E.2d at 1217, and a rational jury here could find that Plaintiff's reliance on the oral representations was reasonable, even in the light of arguably contradictory statements in the voluminous documents that Kelleher assured Carey he need not read. Moreover, the cases cited by Defendant are distinguishable. *Sprague v. General Motors Corp.,* 133 F.3d 388 (6th Cir. 1998), involved alleged oral modifications to ERISA written plan documents. The court noted that ERISA " 'has an elaborate scheme in place for beneficiaries to lean their rights and obligations at any time, a scheme that is built around reliance on the face of written plan documents.' " *Sprague,* 133 F.3d at 402 (quoting *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 83, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995)). The court then held that the plaintiffs could not recover based on alleged oral modifications to such written plan documents based on either breach of contract or promissory estoppel. Here, unlike in *Sprague,* there is no policy clearly stated in federal law to encourage reliance on the exact terms contained in a written agreement, especially where an average person reasonably could understand oral promises to supersede those terms. The other case cited by Defendant, *Grove v. Ohio State University,* 424 F.Supp. 377 (S.D.Ohio 1976), likewise is unavailing. There, the court held that a statement during an interview by a member of the admissions committee that he would recommend the applicant for admission was "hardly a promise of admission and, in any event, its effect is negated by defendants' letter to plaintiff [that rejected his admission.]" *Grove,* 424 F.Supp. at 389. The promise here was much stronger than the statement in *Grove,* and the factual situation here is not nearly as clear cut.

from which a jury could conclude that he was injured by this reliance. He spent considerable money in purchasing the van, which was ultimately repossessed.

Plaintiff also has presented a valid claim for promissory estoppel based on his wife quitting her job at Honda. The same evidence as outlined above could be used to find a clear and unambiguous promise by Defendant. Plaintiff and his wife at least arguably relied upon the statement that "everything was a go" in making the decision for Jackie to submit her resignation. A jury could find that this was a reasonable step to take based on the assurance that Plaintiff soon would be earning substantial additional income from the FedEx Home Delivery contract. Plaintiff also has provided evidence that this reliance was foreseeable by Kelleher. Specifically, Plaintiff first told Kelleher about the plan for his wife to quit her job on January 11, 2001. Plaintiff also informed Kelleher when Jackie submitted her resignation. The injury caused by this reliance was the loss of Jackie's income, assuming that Jackie would not have quit her job absent the promise from Defendant.

■ Plaintiff has not established that he has a promissory estoppel claim that would allow him to recover for the profits he lost by failing to procure the FedEx contract. Promissory estoppel does not allow a plaintiff to recover if he would have been in the same position without the promise. *E.g., Carlisle v. T & R Excavating, Inc.*, 123 Ohio App.3d 277, 704 N.E.2d 39, 46 (1997) (citing *Restatement (Second) of Contracts* § 90 cmt. f (1981)). Here, had there been no promise, Plaintiff also would not have obtained these profits. Based on the two theories outlined above, however, Defendant's Motion for Summary Judgment is **DENIED** as to Plaintiff's promissory estoppel claim.

### · D. Fraud

Defendant contends that there is absolutely no evidence that it engaged in fraud. Defendant asserts that there is no evidence that Kelleher made false representations to Plaintiff or intentionally and knowingly misled Plaintiff during the application process. According to Defendant, it always intended to give Plaintiff a route, but Plaintiff never gave Defendant the opportunity to do so.

Plaintiff maintains that he has presented sufficient circumstantial evidence to allow a reasonable trier of fact to conclude that Defendant never intended, either in 2001 or in 2002, to provide him with a route. Plaintiff's theory is that when Kelleher induced him to go through the qualification process, he had no real intent to contract with Plaintiff but rather was interested in having a qualified temporary driver who could fill in for contractors as needed.

■ The elements of fraud in Ohio are (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 700 N.E.2d 859, 868 (1998) (quoting *Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 462 N.E.2d 407, 409 (1984)). Direct evidence of fraud need not be adduced; rather, " 'fraud may be established by evidence which is wholly circumstantial.' " *Miller's Bottled Gas, Inc. v. Borg–Warner Corp.*, 955 F.2d 1043, 1049 (6th Cir.1992) (quoting *Grant v. Wrona*, 662 S.W.2d 227, 229 (Ky.Ct.App.1983)); *accord Doyle v. Fairfield Mach. Co.*, 120

Ohio App.3d 192, 697 N.E.2d 667, 677 (1997). Fraud generally cannot be predicated upon promises or representations relating to future actions or conduct. *Tibbs v. Nat'l Homes Constr. Corp.*, 52 Ohio App.2d 281, 369 N.E.2d 1218, 1222 (1977) (citing 24 *Ohio Jurisprudence* § 38, at 646–47 (2d ed.)). Where, however, a malefactor makes a promise of future action, occurrence, or conduct, and at the time he makes the promise has no intention of keeping the promise, an action for fraud may lie. *Tibbs*, 369 N.E.2d at 1223; *see Coal Res., Inc. v. Gulf & W. Indus., Inc.*, 756 F.2d 443, 446 (6th Cir.1985) (noting that "it is clear that making a contractual promise with no present intention of performing it constitutes promissory fraud in Ohio").

 Plaintiff adequately has established a claim of fraud for many of the same reasons stated *supra*, in the discussion of promissory estoppel and in the discussion of pretext. Were a jury to believe Plaintiff's statements and disbelieve Kelleher's statements, it could find that the elements of fraud have been met. Specifically, it could find that Kelleher promised to give Plaintiff a route, that this promise was material under the circumstances, and that, at the time he made the promise, Kelleher had no intention of allowing Plaintiff to become an independent contractor but, rather, hoped that he could use Plaintiff as a temporary driver. The jury then could conclude that Kelleher intended Plaintiff to rely upon the promise since he kept stringing Plaintiff along with the same promises and assurances, that Plaintiff justifiably relied on this promise, and that Plaintiff was injured by this reliance. The promise at issue here was different than the promises in *Tibbs*, which the court found to constitute mere "puffing." *Tibbs*, 369 N.E.2d at 1224. Rather, it was a clear and unambiguous statement that Defendant would give Plaintiff the Westerville/Worthington route once the

splitting of that route was approved and, in 2002, that Defendant would give Plaintiff one of four routes that was coming available. Based on evidence of Kelleher's alleged lies, delays, and failure to mention to Plaintiff the requirement that he procure a qualified backup driver, a reasonable jury could determine that, at the time he made the promises, Kelleher never intended to contract with Plaintiff. Defendant's Motion is therefore **DENIED** as to Plaintiff's fraud claim.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's breach of contract claim and **DENIES** Defendant's Motion as to Plaintiff's race discrimination, promissory estoppel, and fraud claims.

**IT IS SO ORDERED.**